## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Andre Smith, being first duly sworn, hereby depose and state as follows:

## BACKGROUND OF AFFIANT

1. I am a police officer employed by the Manchester Police Department in New Hampshire, and a deputized Task Force Officer ("TFO") to the U.S. Drug Enforcement Administration's Manchester, New Hampshire District Office ("DEA MDO"). I am the case officer with primary responsibility over the investigation herein described. I have direct and indirect knowledge of the information included herein.

2. As a DEA TFO, I am authorized to perform federal law enforcement functions outlined in 21 U.S.C. § 878(a), pursuant to cooperative enforcement arrangements authorized by 21 U.S.C. § 873(a)(7), including the execution and service of search warrants issued under the authority of the United States, which encompass the investigation of federal drug and money laundering violations under Title 21 and Title 18 of the United States Code. As described later herein, I am engaged in the enforcement of federal criminal laws, and, thus, I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(c) and am also authorized to request the issuance of a criminal complaint.

3. I have been a full-time certified police officer in New Hampshire since July 2012. I am presently a Manchester Police Detective in the Special Enforcement Division. I have served as a TFO to DEA MDO since August 2023. I have completed several trainings related to narcotics and criminal interdiction hosted by various different entities to include the DEA.

4. I have participated in numerous narcotics investigations where I have been utilized for surveillance, debriefing of witnesses and informants, arresting drug dealers and users,

1

and serving search warrants and arrest warrants. I have learned and observed the different methods that drug dealers and users utilize to sell or use narcotics.

5. Through my training, education and experience, I have gained a nuanced understanding of criminal drug distribution activity. I have become generally familiar with the way that narcotic distributors conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement. Based on my training and experience, I am familiar with the various methods of operation employed by narcotics traffickers to further their illicit operations.

6. I have consulted various sources of information to support my statements in this Affidavit. These statements are based on my participation in this investigation, as well as information I consider reliable from the following sources: my experience investigating drug trafficking offenses; oral and written reports and documents about this investigation that I have received from members of federal, state, and/or local law enforcement agencies; discussions that I have had concerning this investigation with other experienced narcotics investigators; physical surveillance conducted by federal, state, and/or local law enforcement agencies, the results of which have been reported to me either directly or indirectly; public records and law enforcement databases, among other sources.

7. This Affidavit distinguishes between my direct and indirect knowledge of the matters asserted. Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement officers, and I specifically relied on oral reports from other law enforcement officers. When information is based on my personal knowledge or conclusion, it will be so stated.

8. This Affidavit is not an exhaustive account of information gathered during the investigation. As this Affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of the requested criminal complaint(s), I have not included each and every fact concerning every aspect of the investigation that is known to me. I have set forth only the facts that I believe are necessary to establish probable cause to support the requested criminal complaint(s).

## STATUTORY AUTHORITY

9. This matter stems from an investigation into violations of 21 U.S.C. §§ 841(a)(1) and 846. Section 841(a)(1) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." 21 U.S.C. § 841(a)(1). Section 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.

10. This Affidavit is submitted in support of the issuance of criminal complaint(s), under Rules 4 and 4.1 of the Federal Rules of Criminal Procedure, charging RONNY RAMOS ("RAMOS") and RILEY THIBODEAU ("THIBODEAU") with one count of conspiracy to distribute or possess with intent to distribute controlled substances, from on or about March 2023 and continuing through the present, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

## INVESTIGATION BACKGROUND

11. During the week of October 23, 2023, Manchester police executed a search warrant at a Manchester, New Hampshire residence and seized approximately 395 grams of fentanyl, approximately 125 grams of cocaine, and approximately $20,000 in U.S. currency from

an individual ("CS") who subsequently cooperated in this investigation. As a result of this seizure, agents met with the CS, who gave statements against the CS's own penal and/or pecuniary interests regarding personal involvement in narcotic distribution. The CS also assisted this investigation by providing details about the CS's role in a narcotic distribution scheme involving two individuals, including a source of narcotic supply based in Lawrence, Massachusetts.

12. On October 27, 2023, at approximately 7:08 A.M., during a debriefing with law enforcement, the CS provided information on a Hispanic male known to CS as "Rodney," described as a dark-skinned male, in his late 20s, with puffy hair, and a phone number of ▆▆▆▆-2834. "Rodney" was later positively identified as RONNY RAMOS (DOB: ▆▆ 1992). The CS advised that the CS has known RAMOS since 2021 and knows RAMOS to sell methamphetamine. The CS met RAMOS while both were incarcerated at the New Hampshire State Prison and later released to the same halfway house in Manchester, New Hampshire. This information was corroborated by New Hampshire Probation/Parole Officer Jason Myers. New Hampshire Probation/Parole Officer Chris Regan was able to confirm that the phone number RAMOS provided to him is the same number ▆▆▆▆-2834 that the CS uses to contact RAMOS.

13. The CS explained that the approximately $20,000 seized during the search warrant execution by Manchester Police was money provided to the CS by a male known to the CS as "Youngin," who was identified by New Hampshire Probation/Parole Officer Jason Myers as RILEY THIBODEAU (DOB: ▆▆ 1998). The CS explained that THIBODEAU is from Maine but also did state prison time with the CS in New Hampshire. The CS stated that THIBODEAU provides the CS with the money up front, with the intention of the CS picking up

10-12 pounds of methamphetamine from RAMOS in Massachusetts, to be delivered for THIBODEAU in New Hampshire.  The CS explained to investigators that the CS has brokered four such separate methamphetamine deals between RAMOS and THIBODEAU, a scheme that began sometime in the beginning of March 2023.  Each of the deals consisted of 10-12 pounds of methamphetamine and a money exchange of approximately $20,000 in cash.  All four deals occurred in Massachusetts roughly a month and a half apart.  The CS stated that THIBODEAU will call RAMOS and place the 10-12 pound order of methamphetamine.  RAMOS will then instruct THIBODEAU to bring the money to the CS.  Once the CS has the money, the CS will then place a call to RAMOS confirming that the CS has the money.  The CS stated that once the CS notifies RAMOS that the CS has the $20,000, RAMOS takes approximately one week to secure the 10-12 pounds of methamphetamine.

14. I am aware that the CS is cooperating and assisting this investigation in the hopes for consideration or leniency regarding pending charges of possession with intent to distribute cocaine and fentanyl relating to the narcotic seizure during the search warrant execution by Manchester police.  I am aware that the CS has a criminal history.  The CS's criminal history includes convictions for sale of controlled drugs, possession of controlled drugs, and delivery of articles to a prisoner.  The CS has not previously cooperated with law enforcement, but information provided by the CS has been corroborated by investigators where possible.

15. To establish indicia of credibility and reliability in the information provided by the CS, the CS admitted to past involvement in criminal drug activity, in which the CS either possessed or distributed narcotics.  As a result, the CS knows what narcotics look like and how they are packaged for distribution and distributed, and knows the jargon associated with drug distribution, the various drug types and quantities, and the prices typically charged for narcotics.

Also, the identity and contact information of the CS, including the CS's true first and last names, active telephone number, and current address, are known to me and other law enforcement agents involved in this investigation.

16.   Further, the CS indicated having direct knowledge of said reported activities, based on the CS's prior communications and personal interactions with RAMOS and THIBODEAU.  Also, since October 27, 2023, the CS has worked at the direction and/or under the supervision of law enforcement, consistent with standard protocols, procedures, or best practices regarding the use of confidential informants, as applicable.  However, the CS's identity and contact information, and certain details provided by the CS showing the extent of CS's assistance or cooperation, are being withheld at this time for several reasons, including the risk of harm to the CS and the risk of jeopardizing the investigation that is posed by a premature disclosure.

17.   Notwithstanding these omissions, I have demonstrated that the information provided by the CS is trustworthy by independently corroborating material aspects of the information provided by the CS in this investigation.  The information provided by the CS and its later corroboration are discussed below.

18.   As part of this investigation, law enforcement conducted a criminal history check for RAMOS.  Through this check, investigators learned that RAMOS has been convicted of drug related charges in Massachusetts and New Hampshire.  In 2020, RAMOS was convicted of felony sales crack/heroin out of Rockingham Superior Court in New Hampshire, along with disobeying and reckless conduct with a deadly weapon.  In 2019, RAMOS was convicted of misdemeanor possession of a narcotic drug and unlawfully carrying a loaded firearm out of Lawrence District Court in Massachusetts.  In 2016, RAMOS was convicted of misdemeanor

possession of a Class D drug with intent to distribute out of Lawrence District Court in Massachusetts. Both drug convictions in Massachusetts and New Hampshire tend to corroborate the CS's claim that RAMOS is involved in drug distribution.

19. Law enforcement also conducted a criminal history check for THIBODEAU. Through this check, investigators learned that THIBODEAU was convicted for misdemeanor narcotic possession in 2017 in Portsmouth, New Hampshire, and convicted of felony narcotic possession with intent to sell in 2019 in Concord, New Hampshire. Again, these drug convictions also tend to corroborate the CS's claim that THIBODEAU is similarly involved in drug distribution.

20. In furtherance of this investigation, on October 27, 2023, Manchester Police investigators met with the CS at an undisclosed location. The CS stated that during the past few methamphetamine transactions, the CS met RAMOS in the Texas Roadhouse parking lot in Methuen, Massachusetts. According to the CS, during each prior deal, RAMOS showed up in different vehicles and was usually seated in the front passenger seat. The CS advised that both RAMOS and the CS will get out of their respective vehicles, and RAMOS and the CS will then conduct the exchange of $20,000 for the pre-determined quantity of methamphetamine between the two vehicles.

21. To corroborate the information provided by the CS, investigators identified historical information showing contacts indicative of a conspiracy to distribute or possess with intent to distribute large quantities of methamphetamine.

22. Specifically, the CS was able to provide Manchester Police investigators with information regarding the four prior methamphetamine transactions he brokered between THIBODEAU and RAMOS. The CS explained that the ███████1827 phone number utilized

7

by THIBODEAU and the ███████-2834 number utilized by RAMOS remained the same throughout the course of the last seven months.

23. The first brokered drug transaction occurred approximately seven months ago, in March 2023. The CS advised that the CS was instructed by RAMOS to meet at a Wendy's restaurant in Lawrence, Massachusetts, to pick up 12 pounds of methamphetamine for the pre-arranged price of $20,000. The CS stated that the CS brought $20,000 cash belonging to THIBODEAU and the exchange went roadside in the parking lot, in between the CS and RAMOS's respective vehicles. After the CS took custody of the 12 pounds of methamphetamine, the CS placed a phone call to THIBODEAU. THIBODEAU then instructed the CS to meet him on Somerville Street in Manchester, New Hampshire, that same day. Later that day, the CS met THIBODEAU in Manchester and provided him with the 12 pounds of methamphetamine.

24. Approximately a month and a half after the first methamphetamine transaction, the CS brokered the second deal between THIBODEAU and RAMOS. The CS advised that the CS again was instructed by RAMOS to meet at the Wendy's restaurant in Lawrence, Massachusetts, to pick up 12 pounds of methamphetamine for the pre-arranged price of $20,000. The CS again provided RAMOS with the $20,000 cash he was given by THIBODEAU and the exchange went roadside in the parking lot, in between the CS and RAMOS's respective vehicles. After the deal was complete, the CS placed a phone call to THIBODEAU. THIBEODEAU then instructed the CS to meet on Somerville Street in Manchester, New Hampshire. Later that day, the CS met THIBODEAU in Manchester and provided him with the 12 pounds of methamphetamine.

25. Approximately a month and a half after the second methamphetamine transaction, the CS brokered the third deal between THIBODEAU and RAMOS. The CS advised that the CS

was instructed by RAMOS to meet at a liquor store in Lawrence, Massachusetts, near the Wendy's restaurant to pick up the 12 pounds of methamphetamine for the pre-arranged price of $20,000. The CS again provided RAMOS with the $20,000 cash that THIBODEAU gave the CS and the exchange went roadside in the liquor store parking lot. The deal went in between the CS and RAMOS's respective vehicles. After the deal was completed, the CS placed a phone call to THIBODEAU. THIBEDEAU then instructed the CS to meet on Somerville Street in Manchester, New Hampshire. Later that day, the CS met THIBODEAU in Manchester and provided him with the 12 pounds of methamphetamine.

26.     Sometime in October 2023, the CS brokered the fourth deal between THIBODEAU and RAMOS. The CS advised that the CS was instructed by RAMOS to meet at the Texas Roadhouse restaurant in Methuen, Massachusetts, to pick up 10 pounds of methamphetamine for the pre-arranged price of $20,000. The CS again provided RAMOS with the $20,000 cash that THIBODEAU gave the CS. The exchange went roadside in the parking lot of Texas Roadhouse, in between the CS and RAMOS's vehicles. After the deal was complete, the CS placed a phone call to THIBODEAU and was instructed to meet at a residence in Raymond, New Hampshire. Later that day, the CS met with an unknown male and provided him with 10 pounds of methamphetamine.

27.     On October 31, 2023, investigators obtained toll records for RAMOS's 2834 telephone. A review of a "hot list" showing a summary or excerpt of the toll records associated with RAMOS's 2834 telephone showed that, between October 3, 2023 and October 28, 2023, RAMOS's 2834 telephone and THIBODEAU's 1827 telephone had 11 calls between each other. This information allowed us to corroborate the information provided by the CS that RAMOS and

THIBODEAU are in contact with each other and did make contact in and around the time that the fourth transaction was being arranged.

28.    With respect to the first three methamphetamine transactions described by the CS, the CS was unable to provide phone logs or text messages to corroborate the information provided the CS, as it has since been deleted from the CS's cell phone. Based on my training and experience, I know that it is not uncommon for individuals involved in drug trafficking to delete or destroy information relating to their involvement. However, the CS was able to provide more recent text messages between him and THIBODEAU, on October 17, 2023, where THIBODEAU provided the CS a meet location of ▓ Prescott Road in Raymond, New Hampshire, and asked the CS for an "ETA". The CS explained that the CS was being directed by THIBODEAU to bring the 10 pounds of methamphetamine to the location indicated.

29.    To further corroborate the information provided by the CS, investigators also arranged for the delivery of large quantities of methamphetamine from RAMOS to THIBODEAU, utilizing the CS as the intermediary, consistent with his role in the four prior transactions described earlier.

30.    To that end, on October 27, 2023, at the direction of investigators, the CS placed a phone call to RAMOS over the 2834 telephone to discuss tentative details of a methamphetamine transaction. During the recorded phone call, RAMOS made mention of wanting to come up later that same day and meet. The CS was able to explain to RAMOS that he was unable to and instead set the deal for October 31, 2023.

31.    On October 30, 2023, Manchester Police investigators met with the CS at an undisclosed location. At the direction of investigators, the CS placed a phone call to THIBODEAU to discuss tentative details of the methamphetamine transaction. During the

10

recorded phone call, the CS explained to THIBODEAU that he would be available the following day, October 31, 2023, at approximately 2:00 p.m., to pick "that" up from RAMOS, referring to the methamphetamine.  The CS then explained to THIBODEAU that the CS would have to come back to Manchester and put "that" away, referring to the methamphetamine, so they can meet on October 31, 2023 or November 1, 2023.  The CS then said to THIBODEAU, "I'll be with it in Manchester, tell me where we are going to meet."  THIBODEAU then replied, "yeah, yup" acknowledging the arrangement.  The CS then explained to THIBODEAU that the has been unable to get in touch with RAMOS, that his phone is off, and asked THIBODEAU if he can get in touch with "Rodney."  THIBODEAU replied, "I'll try and see what's up with him from my phone."

32.     On October 31, 2023, Manchester police investigators met with the CS at an undisclosed location.  At the direction of and in the presence of investigators, the CS placed a recorded phone call to RAMOS to discuss tentative details of the methamphetamine transaction.  During the recorded phone call in Spanish, which was translated to English by a DEA employee and native Spanish speaker, the CS explained to RAMOS that the CS would be available today and that it needed to be done today by 2:30 p.m., as the CS had prior obligations.  The CS stated that, after the deal the CS had to head up to Manchester and then down to Lynn.  RAMOS responded, "we can do it now," to which the CS said, "no, I am just telling you so you can be ready when I call you."  RAMOS then responded, "wham bam thank you ma'am."  The CS then said, "in the same place, in the T," referring to Texas Roadhouse in Methuen, Massachusetts, and RAMOS replied, "you know it, we don't have to talk about it anymore."  The CS then said, "I will call you when I am on my way, be ready."

11

33. On October 31, 2023, at approximately 2:05 p.m., Manchester Police investigators met with the CS at an undisclosed location where the CS was searched along with his vehicle for any contraband with negative results, meaning none where found. At the direction of and in the presence of investigators the CS placed a recorded phone call to RAMOS over the 2834 telephone to reaffirm the meet. During the telephone communication with RAMOS, the CS stated, "I will be there in 20 minutes." RAMOS replied, "I am with my wife, we are coming from the hospital." It should be noted that at this time a BOLO for a Honda CRV was put out to all personnel on scene, advising that it could be the potential target vehicle.

34. At approximately 2:23 p.m., the CS entered the CS's vehicle and left the undisclosed meet location. At approximately 2:33 p.m., the CS pulled into the Texas Roadhouse parking lot in Methuen and parked his vehicle where instructed. At approximately 2:45 p.m., a Honda CRV bearing Massachusetts registration #9SA226, registered to JUDITH MARTINEZ, was observed pulling onto an access way from Broadway Street, directly behind the Texas Roadhouse. Investigators observed a male operator and a female in the front passenger seat. The vehicle proceeded to take the access way lower ramp which leads to the Texas Roadhouse parking lot. The CRV then backed into a parking spot directly next to the CS vehicle. The CS and RAMOS were both observed by investigators exiting their vehicles and meeting directly between them. TFA Jarred Matyka was able to identify the operator of the Honda CRV meeting with the CS as RAMOS. At this time members of law enforcement then converged on RAMOS taking him into custody without incident. A search incident to arrest at Salem Police Department by TFA Jarred Matyka yielded a small plastic baggie containing a white powdery substance believed to be cocaine in his pants pocket. A field test of this suspected cocaine tested positive for the presence of cocaine HCL.

35. Meanwhile members of law enforcement also detained the front passenger of the CRV, subsequently identified as JUDITH MARTINEZ. MARTINEZ was advised of her *Marinda* warnings and agreed to speak with investigators. DEA Group Supervisor Garth Hamelin observed a blue gift bag on the front driver's seat of the CS's vehicle containing a large amount of glass-like shards sealed in clear plastic bags suspected to be methamphetamine. GS Hamelin maintained custody of the suspected methamphetamine and transported it to Salem, New Hampshire Police Department. A field test of this suspected methamphetamine tested positive for the presence of methamphetamine and weighed approximately 10 pounds.

36. While speaking with MARTINEZ, she advised that she was pregnant and was coming from a routine visit at the clinic. MARTINEZ stated that she left ▮ Bailey Street, Lawrence, Massachusetts, with RAMOS at approximately 1:30 p.m. MARTINEZ also stated that she got into the CRV first (passenger seat) while RAMOS loaded up the vehicle but was unaware of the items he loaded. After leaving the clinic, MARTINEZ was told by RAMOS that he had to "make a stop and see someone." MARTINEZ confirmed that while RAMOS was driving, RAMOS was in communication with someone via phone updating time and location. MARTINEZ stated that they pulled into the Texas Roadhouse and backed into a parking spot alongside a vehicle. MARTINEZ advised that she had never seen the vehicle or the male driver before. MARTINEZ stated that RAMOS then exited the vehicle and made his way between the vehicles and introduced her to the driver as his wife. MARTINEZ stated that "police then jumped out of nowhere and arrested him, I had no clue what was going on, I was in shock." MARTINEZ was able to confirm that she has been dating RAMOS for the past year and that they have been living together "for the past couple months" but had no knowledge of RAMOS distributing narcotics.

13

37. Manchester investigators debriefed the CS at an undisclosed location and the CS stated that while waiting in the Texas Roadhouse lot, the CS was contacted by RAMOS and he advised that he was five minutes away. The CS stated that a Honda CRV being operated by RAMOS with an unknown female passenger backed into the parking spot alongside the CS. The CS stated that the CS had never seen this female before. At this time, the CS and RAMOS both exited their vehicles and met in between them. RAMOS then introduced the female as his wife and proceeded to remove a large blue gift bag from the rear driver side seat. RAMOS then placed the blue gift bag on the front driver's seat of the CS's vehicle. The CS stated that at this time the CS told RAMOS that the CS was going to get the money out of the trunk.

## CONCLUSION

38. I submit that the facts contained in this Affidavit establish probable cause to believe that from on or about March 2023 and continuing through the present, RONNY RAMOS and RILEY THIBODEAU have conspired to distribute or possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Therefore, I respectfully request that criminal complaints be issued, under Rules 4 and 4.1 of the Federal Rules of Criminal Procedure, to charge and support the arrest of RONNY RAMOS and RILEY THIBODEAU.

/s/ Andre Smith
Detective Andre Smith
Task Force Officer
U.S. Drug Enforcement Administration

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: 11/8/2023

Time: 11:13 a.m.

/s/ Talesha Saint-Marc
HONORABLE TALESHA SAINT-MARC
UNITED STATES MAGISTRATE JUDGE